IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT PAUL PARSELL, | ) | Case No. 3:17-cv-01319 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Robert Paul Parsell, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability and Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supported the ALJ's residual function capacity ("RFC") determination that Parsell could perform light work with specified limitations, and her evaluation of Parsell's statements concerning the intensity, persistence, and limiting effects of his symptoms, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Parsell applied for DIB and SSI on August 14, 2013, alleging a disability onset date of September 1, 2006.  (Tr. 191)  Parsell alleged that he could no longer work due to his back,

limited use in his right hand, stomach problems, diabetes, and depression. (Tr. 454) Parsell's applications were denied initially (Tr. 326-31) and on reconsideration. (Tr. 338-40, 342-43) Parsell filed a written request for rehearing on May 14, 2014. (Tr. 350-51) Administrative Law Virginia Herring heard the case on January 6, 2016 (Tr. 191) and denied Parsell's claim on March 29, 2016. (Tr. 188) The Appeals Council denied further review on April 26, 2017, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3)

## III.    Evidence

Parsell now raises two arguments: (1) the ALJ failed to support her RFC findings that Parsell could perform light work with additional limitations by substantial evidence; and (2) the ALJ's determination of Parsell's credibility was not supported by substantial evidence. ECF Doc. 13, Page ID# 2028. Because the issues are limited, it is not necessary to summarize the entire record.

### A.    Personal, Educational and Vocational Evidence

Parsell was 52 years old on the date of the hearing. (Tr. 215) He has a high school education and served in the United States Navy from 1982 to 1986. (Tr. 222, 451) Parsell worked as a field appraiser, laborer, and warehouse/forklift operator. (Tr. 278) Parsell also worked as a pizza delivery person and performed stocking duties at a pizza restaurant for a three month period in 2012. (Tr. 253)

### B.    Medical Records Related to Parsell's Mental and Physical Conditions

Parsell has a history of surgeries that took place prior to the alleged onset date of his conditions. Parsell received a meniscectomy in 1993 after he fell and tore his meniscus. (Tr. 1185) Parsell had surgery to repair a tear in his right rotator cuff in 1997. (Tr. 1367) In 2013,

2

Parsell re-tore his rotator cuff.  (*Id*.)  Parsell had a discectomy at the L4-5 level of his back in 1997.  (*Id*.)

On June 22, 2006, Parsell sustained a crushing type injury to his right hand that resulted in the amputation of his right index and middle fingers through the distal interphalangeal joint, fracture of his ring finger, and possible fracture of the small finger.  (Tr. 516-17, 520, 522-23)  In October 2006, Paul A. Cook, M.D. found Parsell continued to have ischemia at the tips of his fingers and contractures of his proximal interphalangeal ("PIP") joints.  (Tr. 510)

There is little medical evidence for the period from the remainder of 2006 through 2009 relevant to Parsell's claims of error.

On December 28, 2010, gastroenterologist, Ashley Faulx, identified a tumor in Parsell's esophagus and recommended surgical resection.  (Tr. 591)  On March 31, 2011, surgeon Jason Robke performed flexible esophagogastroduodenoscopy and transhiatal esophagectomy to remove the carcinoma.  (Tr. 1007-09)  Pathology testing showed the lymph nodes and margins of resection were negative for malignancy.  (Tr. 918-19)  Because Parsell developed hypotension after the surgery, doctors took him back to the operating room where bleeding was located and stopped.  (Tr. 550)  The follow-up surgery damaged Parsell's spleen, causing him to have a splenectomy.  (Tr. 1368)

On May 24, 2011, Dr. Jason Robke saw Parsell for a post-operative follow-up visit and noted that Parsell was "[d]oing well."  (Tr. 563)  Parsell was tolerating solid food, although he reported some sensation of food sticking.  (*Id.*)  Parsell was eating well, despite a little weight loss.  (*Id.*)  Dr. Robke noted a small abscess on Parsell's abdominal incision.  (*Id.*)  Dietary adjustments were given for Parsell's possible dumping syndrome and Dr. Robke scheduled a dilation procedure.  (*Id.*)  On June 9, 2011, plaintiff underwent a dilation procedure on his

3

esophagus to treat his dysphagia.  (Tr. 543)  Parsell was discharged on June 13, 2011 and instructed to do no lifting.  (Tr. 545)

On July 12, 2011, Parsell reported to Dr. Robke that he had no problems swallowing or with gastric emptying since his dilation procedure.  (Tr. 560)  Parsell's only complaint was intermittent diarrhea.  (*Id.*)  The incisions had healed "very well" and Parsell no longer had any physical restrictions.  (*Id.*)  A nutritionist recommended a diet of soft foods to address Parsell's dysphagia.  (Tr. 557)

On June 24, 2013, Parsell had a follow up nutrition session and indicated that he was having difficulty swallowing solids and had experienced unintended weight loss.  (Tr. 1288)  Parsell reported that he was no longer taking insulin and that the dosages of his diabetes medications had been reduced.  (*Id.*)  The nutritionist recommended two servings of Ensure powder daily.  (Tr. 1289)

On August 8, 2013, Parsell reported to a gastroenterologist that he continued to have some hoarseness, regurgitation of material, dysphagia, early satiety, and obstipation.  (Tr. 1269-70)  The doctor noted that Parsell had delayed gastric emptying and explained to Parsell that methadone was undesirable because it could contribute to delayed gastric emptying.  (Tr. 1270)  The doctor noted tenderness in Parsell's abdomen and explained that the chronic abdominal pain Parsell experienced after the surgical repairs was probably not amenable to any specific therapies.  (Tr. 1270)

On September 11, 2013, Patrice T. Arehart, M.D., completed a medical evaluation of Parsell's mental health complaints of depression, anxiety, and feeling overwhelmed.  (Tr. 1250)  Parsell stated that his symptoms were irritability, crying easily, and not going to sporting events with his friends.  (*Id.*)  Parsell also reported difficulty sleeping.  (*Id.*)  Parsell noted that he had

filed for social security disability benefits.  (*Id.*)  Parsell denied a previous psychiatric history.
(Tr. 1251)  Parsell was diagnosed with opioid and cocaine abuse in February 2010, but he denied
drug use at the evaluation.  (*Id.*)  Dr. Arehart found Parsell was cooperative, friendly, and
dressed and groomed appropriately.  (*Id.*)  She found Parsell had a reactive affect, grossly intact
cognition, and coherent and goal directed speech.  (*Id.*)  Parsell reported having low energy even
though he continued to walk one mile a day.  (*Id.*)  Dr. Arehart diagnosed Parsell with
adjustment disorder with depressed mood and assigned him a GAF score of 62.  (Tr. 1251-52)

On October 22, 2013, Parsell had a follow up appointment regarding his esophageal
cancer.  (Tr. 1228)  Parsell denied dysphagia, nausea, vomiting, and abdominal pain.  (Tr. 1230)
Parsell also denied having back pain, but reported having chronic right shoulder pain.  (*Id.*)  On
examination, Parsell was awake, alert, and not in distress, his gait was normal, and his motor
strength was preserved.  (Tr. 1230)  Parsell's abdomen was soft and non-tender and his bowel
sounds were normal.  (*Id.*)  CT scans and a PET scan did not show evidence of metastatic
disease.  (*Id.*)  The physician found no evidence of recurrence.  (Tr. 1232)

In an October 24, 2013 appointment with Dr. Bertani, Parsell denied chest pain, cough,
nausea, vomiting, and abdominal pain.  (Tr. 1220-21)  That same day Parsell had an initial
psychiatric evaluation with Douglas Misquitta, M.D. and James W. Cannon, M.D.  (Tr. 1213-16)
Parsell complained of worsening depressed mood, poor sleep, tearfulness, low appetite, lack of
motivation, low energy, anhedonia, anxiousness, and feeling overwhelmed and helpless.  (Tr.
1213)  Parsell also reported that he had difficulty with his memory, decreased
concentration/focus, and his mind wandering.  (Tr. 1214)  Dr. Misquitta found Parsell was
oriented, had appropriate attire, coherent thought processes and adequate insight and judgment.
(Tr. 1215)  He also found Parsell's speech was anxious and rambling, mood and affect were

depressed and anxious, and that Parsell endorsed seeing and hearing things.  (*Id.*)  Dr. Misquitta diagnosed Parsell with major depression disorder, recurrent, moderate with psychotic features, and anxiety disorder and assigned him a GAF score of 45.  (*Id.*)  They discussed classes and medications to treat his condition, and Dr. Misquitta prescribed Abilify.  (*Id.*)

On October 30, 2013, Parsell had a preoperative physical before having abdominal panniculus surgery and he reported that he walked one to two miles daily.  (Tr. 1209)  On examination, the physician found Parsell had full range of motion and no significant motor weakness.  (*Id.*)

On December 31, 2014, surgeon Dr. Mayhew performed a duodenal esophagogastroduodenoscopy procedure on Parsell.  (Tr. 1639)  Parsell reported that he was "feeling pretty good," "swallowing and talking much better," and his throat was "just a little" sore.  (*Id.*)  Parsell also stated that he experienced no nausea or vomiting.  (*Id.*)

On July 6, 2015, Parsell saw psychiatrist James W. Cannon M.D. for medication management and supportive psychotherapy.  (Tr. 1585)  Parsell reported that his auditory and visual hallucinations had resolved completely.  (*Id.*)  He reported that he was not as depressed as he had been and had stopped taking venlafaxine.  (*Id.*)  He reported that he was eating fair, but having trouble swallowing and early satiety.  (*Id.*)  Parsell reported that he was sleeping three to five hours.  (*Id.*)  Dr. Cannon found Parsell's mood was fair, affect was anxious, cognition was grossly intact, insight and judgment were adequate, and there was no evidence of delusional thoughts or perceptual disturbances.  (Tr. 1586)  Dr. Cannon discontinued venlafaxine, continued quetiapine for sleep, and started buspirone for Parsell's anxiety.  (*Id.*)

On September 30, 2015, orthopedic surgeon Edwin H. Season, M.D. evaluated Parsell regarding his complaint of chronic and variable pain in his right shoulder and disability.  (Tr.

1476)  Parsell reported his history of right shoulder pain and disability, including his right

shoulder rotator cuff surgery, recurrent pain and stiffness, and attempts to treat his pain

conservatively with therapy and injections.  (*Id.*)  Parsell reported that that non-operative

treatment had failed to give him relief recently.  (*Id.*)  On examination, Dr. Season found

Parsell's shoulder showed full range of motion with pain on motion and no trigger points.  (*Id.*)

He noted that x-rays of Parsell's right shoulder taken on August 19, 2015 showed postsurgical

changes with evidence of resection of the right lateral clavicle.  (Tr. 1477)  Dr. Season ordered

an MRI and referred Parsell to another physician for an evaluation regarding further right

shoulder injury.  (*Id.*)

On October 23, 2015, Parsell had a follow up regarding his esophageal cancer.  (Tr.

1544)  Parsell reported reflux, nausea, and emesis.  (*Id.*)  He reported that he was able to eat

better and was maintaining his weight.  (*Id.*)  On examination, Parsell was alert, oriented, and in

no acute distress.  (Tr. 1545)  His abdomen was soft and non-tender and his bowel sounds were

normoactive.  (*Id.*)  His mood was stable, there were no neurological deficits, and his voice was

mildly hoarse.  (Tr. 1545-46)

### C.    Opinion Evidence

#### 1.    Jams R. Kuhn – U.S. Department of
      Veterans Affairs Examining Physician

On February 2, 2012, James R. Kuhn prepared a disability benefits questionnaire

regarding Parsell's knee and lower leg conditions.  (Tr. 1184)  Dr. Kuhn diagnosed Parsell with a

torn right meniscus and meniscectomy.  (Tr. 1185)  Dr. Kuhn noted that there was no mention of

right knee pain in Parsell's records other than two records concerning right knee pain and

swelling from 1983.  (Tr. 1186)  Dr. Kuhn found Parsell had no limitation in the range of motion

of his knee or lower leg, no functional loss or functional impairment, no tenderness or pain to

7

palpitation for joint line or soft tissues, normal muscle strength in both knees, and no joint instability.  (Tr. 1189, 1191)  Dr. Kuhn noted that Parsell's "knee d[id] not bother him."  (Tr. 1200)  Dr. Kuhn opined that Parsell's knee and/or lower leg conditions did not impact Parsell's ability to work.  (Tr. 1197)  An x-ray of Parsell's knees on February 2, 2012 was normal.  (Tr. 1196-97)

### 2.    Babatunde Onamusi, M.D. – Consultative Examiner

On December 20, 2013, Babatunde Onamusi, M.D. prepared an internal medicine evaluation report.  (Tr. 1367)  Parsell reported his history of diabetes, right shoulder pain, right hand trauma and finger fracture and amputation, lower back pain, rotator cuff surgery and subsequent injury, discectomy at the L4-5 level, and esophageal cancer and subsequent surgery. (Tr. 1367-68)  Parsell reported intermittent moderate to severe right shoulder pain, usually with movement in the shoulder, and associated weakness in the right upper extremity muscle groups. (Tr. 1367)  Parsell described intermittent severe pain in the back that was aggravated by bending, although Parsell was not following up with any doctors for his back pain.  (Tr. 1367-68)  Parsell described radicular pain without numbness in both legs.  (Tr. 1367)  Parsell reported permanent flexion contracture of the PIP joints of the fourth and fifth fingers of his right hand.  (*Id.*)  Parsell reported that he was on pills for blood sugar control, that his blood sugars fluctuated in the 120 to 190 range, and symptoms including fatigue, excessive thirst, numbness and tingling in his hands and feet, calve pain with walking, erectile dysfunction, and occasional low blood sugar symptoms.  (Tr. 1367-68)  Parsell denied any renal or retinal complications related to diabetes. (Tr. 1368)  Parsell denied activity limitations related to his diabetes.  (*Id.*)  Parsell reported that his esophageal cancer was in remission.  (Tr. 1368)

8

Parsell reported that he could sit for 60 minutes, stand for 30 minutes, walk half a block, and lift 10 lbs.  (Tr. 1368)  Parsell reported that he could do housework, laundry, and personal grooming activities, but avoided grocery shopping because he experienced pain with extended walking.  (*Id.*)  Parsell reported that he has no trouble using his hands for gross and fine motor tasks.  (*Id.*)  Parsell reported that he had adapted to the impairment of his right hand and that he could do fine coordination and manipulative tasks including tying shoe laces, pinch grip, fine fingering activities, and buttons.  (*Id.*)

Parsell reported that he last worked for Todco overhead doors in June 2006 driving trucks and fabricating steel, but stopped working after the injury to his hand.  (*Id.*)

On examination, Parsell's abdomen was soft, nondistended, and nontender and his bowel sounds were normoactive.  (Tr. 1369)  Parsell's muscle power and tone were normal in all muscle groups, and his reflexes were normal as well.  (*Id.*)  Parsell walked with a mild limp and without an ambulatory device.  (*Id.*)  Parsell had difficulty squatting and was unsteady walking on heels and toes.  (*Id.*)  His grip strength was 20 lbs. in the right hand 70 lbs. in the left.  (*Id.*)  Parsell was able to reach forward, push, or pull with the upper extremities, could grip and grasp with his right hand in an adapted fashion, oppose the thumb to all the digits, and pinch with the thumb and index and middle fingers.  (*Id.*)  Parsell was able to tie his shoe lace and pick up coins with his right hand.  (*Id.*)  Parsell's second and third fingers had been amputated at the DIP joint level with flexion contracture involving the PIP joints of the fourth and fifth fingers.  (*Id.*)  Dr. Onamusi found Parsell's range of motion in his right shoulder was less than normal, with mild tenderness in the anterior aspect.  (Tr. 1364, 1369)  Dr. Onamusi found no definite weakness involving the rotator cuff muscle complex.  (Tr. 1369)

Dr. Onamusi found Parsell had chronic lower back pain after his lumbar spine surgery, probably secondary to the degenerative disease in the spine. (*Id.*) He found trauma involving Parsell's right hand with amputation to the second and third digits with flexion contracture to the fourth and fifth digits. (*Id.*) He assessed diabetes mellitus with no evidence of microvascular complications. (*Id.*) Dr. Onamusi also assessed chronic right shoulder pain, probably secondary to Parsell's recurrent rotator cuff tear. (*Id.*) Dr. Onamusi opined Parsell was capable of functioning at the light physical demand level as defined in the Dictionary of Occupational Titles. (Tr. 1370)

### 3.    Bruce Goldsmith, Ph.D. and Cynthia Waggoner, Psy.D. – State Agency Psychological Consultants

On December 11, 2013, Bruce Goldsmith, Ph.D. assessed Parsell's mental residual functional capacity. (Tr. 271-274) Dr. Goldsmith found Parsell was not significantly limited in his ability to remember locations and work-like procedures or understand and remember very short and simple instructions, but was moderately limited in his ability to understand and remember detailed instructions. (Tr. 272) Dr. Goldsmith opined that Parsell should be limited to being given simple instructions. (*Id.*) Dr. Goldsmith opined Parsell was not significantly limited in his ability to carry out very short or simple instructions, perform activities within a schedule and maintain regular attendance, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal workday and workweek without instructions from psychological based symptoms and to perform at a consistent pace. (Tr. 272-73) Dr. Goldsmith opined Parsell was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them. (*Id.*) He opined Parsell should be limited to routine, non-fast-paced tasks. (Tr. 273) Dr. Goldsmith opined that Parsell was not

10

significantly limited in his abilities to ask simple questions or request assistance, get along with coworkers or peers without distracting them of exhibiting behavioral extremes, or maintain socially appropriate behavior to adhere to basic standards of neatness and cleanliness, but was moderately limited in his abilities to interact appropriately with the general public and accept instructions and respond appropriately to criticism from superiors.  (*Id.*)  Dr. Goldsmith opined that Parsell should be limited to superficial and minimal social interaction.  (*Id.*)  Dr. Goldsmith opined Parsell was moderately limited in his ability to respond appropriately to changes in the work setting, but was not significantly limited in his abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others.  (*Id.*)  Dr. Goldsmith opined that Parsell should be limited to a relatively static work setting.  (*Id.*)

On April 23, 2014, state agency psychologist consultant Cynthia Waggoner, Psy.D. assessed Parsell's mental residual capacity.  (Tr. 305)  Dr. Waggoner's assessment was the same as Dr. Goldsmiths, except Dr. Waggoner opined that Parsell was moderately limited in his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 305-06)

### 4.    William Bolz, M.D. and Gerald Kylop, M.D. – State Agency Medical Consultants

On January 8, 2014, state agency medical consultant, William Bolz, M.D., assessed Parsell's physical RFC.  (Tr. 270-71)  Dr. Bolz opined that Parsell could lift and/or carry twenty pounds occasionally and ten pounds frequently.  (Tr. 270)  He opined Parsell could stand, walk, or sit for six hours in an eight-hour workday and had an unlimited ability to push and/or pull, limited only by his ability to lift and carry.  (*Id.*)  Dr. Bolz opined Parsell could engage in:

11

climbing ramps and stairs, stooping, and crouching frequently; climbing ladders, ropes, or scaffolds occasionally; and balancing, kneeling, or crawling without limit.  (Tr. 270-71)  Dr. Bolz opined that Parsell was limited in his ability to reach overhead and finger on his right side, but unlimited in his ability to handle and feel.  (Tr. 271)

On April 23, 2014, Gerald Kylop, M.D. assessed Parsell's physical residual capacity and reached the same conclusions as Dr. Bolz.  (Tr. 303-305)

### D.    Testimonial Evidence

#### 1.    Claimant's Testimony

At the January 6, 2016 hearing, Parsell testified that he was 52 years old and lived in a house with his mother, two dogs, and two cats.  (Tr. 215-16)  He stated that his wife was living in a nursing home.  (Tr. 217)  Parsell stated that his driver's license was suspended because he received "a couple OVIs."  (*Id.*)  Parsell stated that he had a high school education and had served in the United States Navy for four years.  (Tr. 218)

Parsell stated that he became disabled on September 1, 2006 when he injured his hand while working the steel fabrication mills at Time Trail Overhead Doors.  (Tr. 219, 222-23) Parsell stated that he did steel fabrication, operated a steel punch press, and drove a forklift while working for Time Trail Overhead Doors.  (Tr. 223)  Parsell stated that he would sometimes have to lift between 45 and 60 pounds while working at Time Trail Overhead Doors.  (Tr. 227) Parsell stated that he worked for International Paper Company, also known as Imperial Bondware Corporation, from 1997 to 2006, where he drove forklifts, moved paper, and stacked boxes of parts on a conveyor line by hand.  (Tr. 223-24)

Parsell worked at Angelo's Pizza in 2012 for four to five months, where he delivered pizzas and tried stocking shelves.  (Tr. 219-20)  Parsell testified that he quit his job at Angelo's Pizza because, although "the driving part was easy," he was "having trouble with the lifting and

12

all that" and he "had some other people tell [him] that [he] shouldn't be doing it because, you

know, it was hurting [him] and stuff."  (Tr. 220)  Parsell noted that he could get the pizzas into

and out of the car and into the houses when delivering pizzas, but had trouble and would need

assistance with stocking and lifting the bags of cheese and pizza sauce cans that were "a little too

heavy for [him]."  (Tr. 220-21)  Parsell stated that he could lift single pizza cans, but would

"[h]urt in [his] chest area and stuff" when he tried to lift whole cases of six pizza sauce cans.

(Tr. 221-22)  He stated that he was "supposed to put the pizza boxes together and stuff," but he

"guess[ed] [he] had a lot of trouble with coordination because [his] right sides not as good as it

was" and he was "pretty clumsy left handed."  (Tr. 221)  Parsell testified that he had also gone to

the wrong place on some deliveries.  (Tr. 250)

Parsell stated that he could not work because he got tired "real easy," vomited, had acid

reflux, and lacked the strength to "lift hardly anything anymore."  (Tr. 228)  He stated that he

had a 15 pound lift limit, but would "get sore real easy" when he tried to lift something and

would hurt when he tried to move things.  (*Id*.)  Parsell stated that his "legs get hurting real bad"

and that he had to wear compression hose when his legs swelled.  (Tr. 228)  Parsell testified that

he was sick a lot, had seven stretches of his throat, vomited, had trouble swallowing, and

sometimes his throat would become sore, especially when he talked a lot.  (Tr. 228-29)  Parsell

testified that he could go up and down stairs very slowly, because he gets tired.  (Tr. 218)  Parsell

stated that he could not bend at the waist or get up after crawling on his hands and knees without

assistance.  (Tr. 242-44)  Parsell stated that he had trouble holding things for a long time and

gripping things with his right hand.  (Tr. 244-45)  Parsell stated that he had a rotator cuff tear,

arthritis in his right shoulder, and trouble with his right shoulder's mobility, especially when

reaching overhead or to the sides.  (Tr. 245)  Parsell testified that his legs would get sore, but he

13

was not sure of the cause.  (Tr. 246)  Parsell stated that he would also throw up, sometimes up to seven times a day, because of his acid reflux and trouble digesting food.  (Tr. 246-47)  Parsell stated that he would elevate his legs when he used his recliner.  (Tr. 247)

Parsell testified that he would try to help his mother with everything he could, including doing the dishes and running a sweeper, but would need to take breaks when he became tired. (Tr. 230)  He stated that he could vacuum for five to ten minutes on a good day before he would need a break and could only vacuum fifteen to twenty minutes on a bad day.  (Tr. 230, 235) Parsell testified that he would get up in the morning, let his dog out or take the dog for a walk, take his medicine, make breakfast, and then sit down and watch TV or prepare to go to a doctor appointment.  (Tr. 240)  Parsell stated that he would accompany his mother to go grocery shopping and she would buy the things on his shopping list.  (*Id.*)  Parsell said he did laundry and mowed his mother's lawn on a riding lawnmower.  (Tr. 241-42)

Parsell stated that he had trouble breathing and coughing fits when "moving around and doing things," but he was fine when sitting down.  (Tr. 231)  Parsell stated that he would get a lot of phlegm buildup and would have five to ten minute coughing fits four to six times a day, four or five days a week.  (Tr. 231-32)  Parsell stated that his coughing fits would cause pain in his chest.  (Tr. 246)  Parsell stated that his gastroenterologist indicated that there was not much he could do to treat Parsell's swallowing and coughing conditions.  (Tr. 232)

Parsell testified that his doctors gave him different medications, including Seroquel, to treat his tiredness, but they said he was tired because he gets "wore out easy and stuff" and he has "a heck of time sleeping."  (Tr. 233)  Parsell stated that he did not experience any side effects from the medications he took, such as Amlodipine, Buspirone, Dulcolax, Lisinopril, Metformin, Gabapentin, Protonix, Zofran, and Harvoni pills.  (Tr. 233-34)  Parsell stated that he tried

physical therapy a few times to treat the trouble with his arm and rotator cuff.  (Tr. 235)  He
stated that he would try to walk a mile every other day, but that he was only able to talk about 15
minutes at the time of the hearing.  (Tr. 236)

Parsell testified that he was seeing a psychiatrist every three months and was taking
Buspirone for "agitation and stuff."  (Tr. 236)  Parsell indicated that he just has mental health
issues, but that he was doing a lot better and his issues do not interfere with his ability to work.
(Tr. 237)  Parsell stated that he did not have problems interacting with anyone at Angelo's Pizza,
but he would sometimes "snap over stupid things."  (Tr. 238)  Parsell stated that he was having
trouble sleeping, would wake up during the night, and would take naps during the day.  (Tr. 238-
39)

## IV.    The ALJ's Decision

The relevant portions of ALJ's March 29, 2016 decision can be paraphrased as follows:[1]

3.    Parsell had the following severe impairments: diabetes mellitus type II, status
      post esophagectomy and gastric pull through due to malignant neoplasm of
      esophagus, status post 1ight distal 2nd and 3rd distal phalanges amputation post
      trauma, status post right rotator cuff surgery, status post 1ight meniscectomy,
      sleep apnea, adjustment disorder with depressed mood, opioid abuse
      unspecified, cocaine abuse unspecified, and chronic depression (20 C.F.R.
      404.1520(c) and 416.920(c)).  (Tr. 194);

5.    After careful consideration of the entire record, the ALJ found that Parsell has the
      residual functional capacity to perform light work as defined in 20 C.F.R.
      404.1567(b) and 416.967(b) except that he can frequently climb ramps and
      stairs, but only occasionally climb ladders, ropes, or scaffolds.  He can
      frequently stoop and crouch, but only occasionally kneel or crawl.  He can
      frequently reach overhead and finger.  He is limited to simple, routine tasks, in
      a static work environment with few changes and when they occur, changes are
      fully explained and gradually introduced.  He cannot work at a production rate
      pace, such as on an assembly line or conveyor belt.  He can have occasional
      interaction with the public, supervisors and coworkers.  (Tr. 196);

6.    Parsell was unable to perform any past relevant work (20 C.F.R. 404.1565 and

---

[1] I include only those findings relevant to the issues Parsell has raised.

416.965).  (Tr. 200);

10. Considering the Parsell's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Parsell can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).  (Tr. 201)

Based on her findings, the ALJ determined that Parsell was not disabled From September 1, 2006 through March 29, 2016, the date of the ALJ's decision.  (Tr. 202)

## V.  Law & Analysis

Parsell alleges both that the ALJ's finding that he can perform light work with limitations and her credibility determination were not based on substantial evidence.  *See* ECF Doc. 13.  For the convenience of the court, I will discuss the alleged the errors in a different order than presented by Parsell.

### A.  Standard of Disability and Review

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and RFC, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied, because, if not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.

1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich.

Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.  The ALJ's Credibility Determination was Based on Substantial Evidence

Parsell argues that the ALJ's credibility determination was not based on substantial

evidence because the ALJ erred in doubting his allegations of pain, weakness, frequent vomiting,

soreness and fatigue.  ECF Doc. 13, Page ID# 2040.

SSR 16-3p superseded SSR 96-7p on March 28, 2016 and was in effect on the date the

ALJ issued his decision.[3]  SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).  SSR 16-3p

eliminated the use of the term "credibility" in order to "clarify that subjective symptom

evaluation is not an examination of an individual's character."  SSR 16-3p, 2016 WL 1119029 at

*1.  The new ruling directs the ALJ to consider whether the claimant's statements about the

intensity, persistence, and limiting effects of symptoms are consistent with the objective medical

evidence and other evidence of record.  *Id.*, 2016 WL 1119029 at *7.  In addition to using all of

the evidence to evaluate the intensity, persistence, and limiting effects of an individual's

symptoms, the Social Security Administration also uses the following factors set forth in 20

C.F.R. 404.1529(c)(3) and 416.929(c)(3): (1) daily activities; (2) the location, duration,

---

[3] The commissioner notes that the ALJ decided the case under SSR 96-7p, rather than SSR 16-3p, which went into effect the day before the ALJ issued her opinion.  *Id.* at 2059 n. 4.  I will analyze the ALJ's decision under SSR 16-3p, because SSR 16-3p was ruling in effect on the date the ALJ issued her opinion.

frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage effectiveness, and side effects of any medications; (5) treatments other than medications; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id*. at *7-8.

Parsell argues that the ALJ doubted his allegations of pain, weakness, frequent vomiting, soreness and fatigue primarily because of his routine household activities, including watching television, taking walks, caring for pets, washing dishes, vacuuming, and mowing the lawn. ECF Doc. 13, Page ID# 2040 (citing Tr. 193, 195, and 197). Parsell argues that his ability to perform daily activities does not equate to the ability to perform full-time work, because a full-time job would not allow for accommodations such as flexibility in scheduling, assistance from others, or work performed below a minimum standard. *Id*. at 2040-41 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007)). The only evidence Parsell cites to support his need for work accommodations is his testimony from the administrative hearing. (Tr. 242-44) The only relevant statement in the administrative hearing transcript that the undersigned can find in the cited page range is Parsell's statement that he would "take a little break" when mowing his mother's lawn. (Tr. 242) The commissioner counters that "the ALJ examined the evidence and properly found that [Parsell's] subjective complaints were not fully credible based on several factors including the objective medical evidence, improvement with treatment, medical opinion evidence, and finally, [Parsell's] activities of daily living. ECF Doc. 15, Page ID# 2059 (citing Tr. 197-200).

"Daily activities are one factor that an ALJ may consider in evaluating 'the intensity and persistence of [a claimant's] symptoms . . . and determining the extent to which [these]

symptoms limit [the claimant's] capacity for work." *Dooley v. Comm'r of Soc. Sec.*, 656 F.

App'x 113, 120 (6th Cir. 2016) (quoting 20 C.F.R. § 404.1529(c)(3)(i)); 416.929(c)(3)(i)); *see*

*also* 2017 WL 5180304, at *7; *Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir.

2013).  The ALJ found that Parsell's described daily activities were "not limited to the extent one

would expect, given the complaints of disabling symptoms and limitations."  (Tr. 200; *see also*

Tr. 195, 230, 241-42, 462-64)  The ALJ noted Parsell testified he was able to go for walks and

perform light housekeeping on a regular basis.  (*Id*.)  The ALJ also noted that Parsell testified he

helped take care of two dogs and two cats and was able to perform light housekeeping chores

with several breaks due to fatigue.  (Tr. 195)  This evidence indicates that Plaintiff was capable

of doing some physical activity and provides support for the ALJ's determination that Parsell's

statements concerning the intensity, persistence, and limiting effects of his symptoms were not

entirely credible.  (Tr. 197, 200)

The ALJ also found that the objective medical evidence and medical records did not

support Parsell's allegations.  (Tr. 197)  The ALJ stated:

> The record shows that the claimant developed hypotension following his March 31, 2011
> transhiatal esophagectomy surgery ([Tr. 550]).  On April 20, 2011, the claimant had a
> cardiac exercise therapy session ([Tr. 637]).  The claimant could walk 150 feet with some
> shortness of breath (id.).  The exercise physiologist, Ralph Burton stated that some of the
> claimant's limitations in walking were attributed to his weight and size (id.).  Additional
> records reflect that the claimant's obesity resolved (testimony, Ex. 1 F/116, 130).
> Furthermore, this assessment was made shortly following the claimant's surgery only
> weeks prior.  Even considering the claimant's previous size, the undersigned finds that
> the claimant could stand, walk, and lift consistent with light work requirements.

(Tr. 197)  The evidence of record does not support this part of the ALJ's analysis.  The ALJ

stated that an exercise psychologist attributed some of Parsell's walking limitations to his weight

and size.  (*Id*.)  But the only reference to Parsell's weight and size in the record the ALJ cited

was the exercise physiologist's statement that Parsell would need an extra-large Rollator due to

his size and weight to assist in his at-home interval walking training.  (Tr. 627)  Other records indicate that Parsell's obesity had resolved, including Parsell's hearing testimony that he was 6'1" tall and weighed 184 lbs., as well as his statements to medical service providers that he had lost a lot of weight.  (Tr. 215, 1214, 1251)  However, Parsell alleged he was disabled because of his back, limitations using his right hand, stomach problems, and depression, not obesity.  (Tr. 450)  Thus, any error in the ALJ's characterization of the record on this point was, at most, harmless.

The ALJ also stated that she had not found Parsell's allegations fully credible.  (Tr. 199)  The ALJ noted that Parsell's difficulty speaking and swallowing and overall weakness suggested a severe impairment, but there were few treatment records that would have supported a finding that his transhiatal esophagectomy surgery limited his work capability.  (*Id.*)  The ALJ noted that despite some occasional abdominal discomfort, Dr. Robke found that Parsell was tolerating oral feedings well and doing well in May and July, 2011.  (Tr. 198, 550, 563, 635).  Parsell underwent several dilation procedures to treat his dysphagia (Tr. 543) and nutritionists recommended Parsell follow a soft food diet with supplements or milk (Tr. 557, 1288).  Parsell sometimes complained of nausea, vomiting, throat hoarseness or soreness, or coughing (Tr. 1071, 1147-48, 1269-70, 1288, 1544); but he also sometimes denied having such difficulties. (Tr. 1220-21, 1230, 1639)  Parsell also continued to take methadone against medical advice after being informed the drug contributed to his delayed gastric emptying.  (Tr. 1269-70)  In December 2014, Parsell reported that he was feeling pretty good, swallowing and talking "much better," not experiencing nausea or vomiting, and that his throat was just a little sore.  (Tr. 1639)  The commissioner further notes that no examiners reported having difficulty conversing with Parsell, despite his reports of hoarseness at times.  (Tr. 1369, 1586)

The ALJ also reasoned that while Parsell's having undergone surgery for his neck, shoulder, back, and esophagus suggested that his symptoms were genuine, "it [wa]s offset by the fact that the record reflect[ed] that the surgery was generally successful in relieving the symptoms." (Tr. 199-200) Parsell does not challenge these findings. This conclusion, coupled with the evidence regarding Parsell's activities of daily living, provided substantial evidence to support for the ALJ's evaluation of Parsell's statements regarding the intensity and persistence of his symptoms.

Parsell also argues that his attempt to return to work in 2012 and his consistently seeking medical treatment for his conditions added to his integrity, illustrated a desire to work, and showed that he was credible and cooperative throughout the disability application process. ECF Doc. 13, Page ID# 2041 (citing Tr. 220-222, 240). But the record makes clear that the ALJ considered this evidence. She stated that Parsell worked temporarily in 2012, but had to stop because the work was too physically demanding and because he had trouble using his hands to perform certain activities. (Tr. 201) The ALJ also thoroughly considered the record and the treatment Parsell sought for his medical conditions. (Tr. 197-99) An ALJ is not required to make explicit credibility findings as to each bit of conflicting testimony, so long as her factual findings as a whole show that she implicitly resolved any conflicts. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

In light of the ALJ's unique opportunity to observe a claimant's demeanor and judge his subjective complaints, an ALJ's credibility finding is entitled to deference and cannot be discarded lightly. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Further, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Id*. at 772. The ALJ cited ample reasons

for discounting Parsell's statements concerning the intensity, persistence, and limiting effects of his symptoms. Parsell's second assignment of error provides no basis for remand, and I recommend it be overruled.

### C. The ALJ's Finding that Parsell Could Perform Light Work is Based on Substantial Evidence

Parsell argues that the ALJ's determination that he had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the added limitations included in the RFC was not supported by substantial evidence. *See* ECF Doc. 13, Page ID# 2038.

"Residual functional capacity is an 'assessment of [the claimant's] remaining capacity for work,' once [his] limitations have been considered." *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) (quoting 20 C.F.R. § 416.945(a)). "It is meant 'to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from – though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities.'" *Id.* (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.2002)).

The ALJ found that Parsell had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 196) The ALJ found that Parsell could also frequently reach overhead, finger, stoop, and crouch, but only occasionally kneel or crawl. (*Id.*) "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Light work "requires a good deal of walking or standing" or, when it involves sitting more of the time, may involve some pushing and pulling of arm or leg controls. *Id.*

Parsell argues the ALJ erred in finding that he could perform frequent fingering and overhead reaching. *See* ECF Doc. 13, Page ID# 2038. Parsell also argues that state agency

medical consultant, Dr. Kylop, opined Parsell was limited to only occasional fingering and overhead reaching with his dominant right upper extremity. *See* ECF Doc. 13, Page ID# 2039 (citing Tr. 304). The ALJ disagreed and gave Dr. Kylop's medical assessment partial weight. (Tr. 199) She stated:

> [T]he undersigned disagrees that the claimant is limited to occasional reaching overhead and occasional fingering because the claimant testified that he was able to put stock on shelves, help his mom with dishes, chores, and laundry. Also, the State agency examination showed that the claimant could pick up coins without issues (Ex.8F/7). Thus, he can frequently use his hands to finger. Furthermore, the claimant testified that while he is right hand dominant, he has adjusted to using his left hand more often for things. Therefore, the undersigned gives the State agency physical assessments partial weight.

(Tr. 199) Parsell argues that the ALJ decision is incorrect because the state agency examination did not show that he could pick up coins "without issues," and because Parsell "is significantly limited in his ability to use his right arm and hand." ECF Doc. 13, Page ID# 2038. Although Dr. Onamusi did not use the exact words "without issue" in his internal medicine evaluation report, he did opine that Parsell was able to function at the light physical demand level. (Tr. 1369-70) Dr. Onamusi noted Parsell was able to grip and grasp, oppose the thumb to all the digits, pinch with the thumb and index and middle fingers of his right hand and tie his shoe lace and pick up coins with his right hand. (Tr. 1369) Based on Dr. Onamusi's report, the ALJ did not err in noting that Parsell could pick up coins without issues.

Parsell also argues that his testimony at the administrative hearing supported his position that he cannot frequently finger or reach overhead. Parsell testified that he had trouble folding pizza boxes, lifting ingredients, and could not reach above his head during his work attempt at Angelo's Pizza. ECF Doc. 13, Page ID# 2038 (citing Tr. 220-222). Parsell also testified that he had trouble folding boxes because he was "pretty clumsy left handed." (Tr. 221) Parsell testified that he had to take breaks when mowing his mother's lawn. ECF Doc. 13, Page ID#

25

2038 (citing Tr. 242).  The ALJ considered this evidence (Tr. 197), but noted that although Parsell testified that he is right hand dominant, he admitted he had adjusted to using his left hand more often for things.  (Tr. 199)  Parsell reported to Dr. Onamusi that he had no trouble using his hands for gross and fine motor tasks, had adapted to the impairment in his right hand, and could do fine coordination and manipulative tasks including tying his shoes laces, pinch grip, fine fingering activities, and buttons.  (Tr. 1368)  Dr. Onamusi's examination findings were consistent with Parsell's reports.  Dr. Onamusi found mild tenderness in the anterior aspect of Parsell's shoulder and that the range of motion in his shoulder was only ten to twenty degrees less than normal.  (Tr. 1364, 1369)  Dr. Onamusi found no weakness involving Parsell's rotator cuff muscle complex.  (Tr. 1369)  Dr. Onamusi found Parsell had a grip strength of 20 lbs. in his right hand and was able to grasp in an adapted fashion.  (Tr. 1369)  The ALJ gave Dr. Onamusi's opinion great weight, because she found it generally consistent with the record as a whole.  (Tr. 203)  Parsell has neither challenged the weight the ALJ gave Dr. Onamusi's opinions nor any of Dr. Onamusi's examination findings.

Parsell also argues the ALJ erred in finding that he could frequently engage in kneeling, crawling, stooping, and crouching.  *See* ECF Doc. 13, Page ID# 2039.  Parsell argues Dr. Onamusi's findings that Parsell had a mild limp and difficulty squatting and walking on his heels/toes indicate that Parsell would have difficulty kneeling, crawling, stooping, and crouching.  *Id*.  Dr. Onamusi also found that Parsell was not unsteady and did not require an assistive device for ambulation and transfer.  (Tr. 1369)  He found Parsell's hips, knees, and ankles had full range of motion, Parsell's left hip had mild tenderness in the lateral aspect, and his dorsolumbar spine had a normal right and left lateral flexion and extension  and flexion that were only five and ten degrees less than normal, respectively.  (Tr. 1365-66, 1369).  Dr. Onamusi

26

opined Parsell was capable of functioning at light physical demand level activities. (Tr. 1370)

Further, a February 2, 2012 examination of Parsell's knees showed that Parsell had full knee

flexion and extension bilaterally, which the ALJ found evidenced that Parsell's status post his

right meniscectomy did not preclude him from performing work at the light exertional level. (Tr.

198, 1366)  State agency reviewing physicians Dr. Bolz and Dr. Kylop also found Parsell could

frequently engage in crouching and stooping and was unlimited in his capacity for balancing,

kneeling, and crawling. (Tr. 271, 304)  I find substantial evidence supported the ALJ's

conclusion that Parsell could frequently engage in kneeling, crawling, stooping, and crouching.

Parsell argues that his symptoms and impairments, including diabetes, status post

esophagectomy and gastric pull through for esophageal cancer, chronic nausea, vomiting, chest

pain, status post right meniscectomy, sleep apnea, and depression, "would all render him unable

to stay on task at least 80% a workday . . . or to sustain a full time work schedule on a regular

and continuing basis." *See* ECF Doc. 13, Page ID# 2040 (citing Tr. 255).  Parsell cites no

evidence to support his argument that he would be unable to stay on task at least 80% of a

workday.  In contrast, the medical expert opinions indicate Parsell is able to perform light work

with some postural or manipulative limitations and is only moderately or not significantly

limited regarding his understanding, memory, concentration, persistence, social interactions, and

adaptation. (Tr. 270-74, 303-07, 1370)

The ALJ also found that Parsell's statements concerning the intensity, persistence, and

limiting effects of his symptoms were not entirely credible. (Tr. 197)  The ALJ noted that

Parsell's daily activities, including performing light housekeeping on a regular basis, were not

limited to the extent one would expect, given his complaints of disabling symptoms and

limitations. (Tr. 200)  "'[A]n ALJ is not required to accept a claimant's subjective complaints

27

and may properly consider the credibility of a claimant when making a determination of disability.'" *Schmiedebusch v. Comm'r of Soc. Sec. Admin.*, 536 F. App'x 637, 649 (6th Cir. 2013) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir.2003)). The ALJ's finding that Parsell's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible supported the ALJ's determination that Parsell was capable of performing light work.

I find that substantial evidence supports the ALJ's RFC finding that Parsell could perform light work with the added limitations specified in the RFC. Parsell's first assignment of error provides no basis for remand and should be overruled.

## VI.     Recommendation

Because substantial evidence supported the ALJ's residual function capacity determination, her conclusion that Parsell could perform light work, and her evaluation of Parsell's statements concerning the intensity, persistence, and limiting effects of his symptoms, I recommend that the final decision of the Commissioner be AFFIRMED.


Dated: May 30, 2018

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).